UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAMBRIA COMPANY LLC, | Civ. No. 21-10092 (MAS)(JBD) |
| Plaintiff, | |
| v. | **MEMORANDUM ORDER** |
| HIRSCH GLASS CORP., *d/b/a* SPECTRUM QUARTZ, | |
| Defendant. | |

The Court here resolves three discovery disputes [Dkt. 103] in this patent infringement action between plaintiff Cambria Company LLC ("Cambria") and defendant Hirsch Glass Corp., d/b/a Spectrum Quartz ("Hirsch"). Hirsch seeks an order compelling the disclosure of (i) a prior settlement agreement between Cambria and another party stemming from prior patent litigation; (ii) Cambria's confidential "recipes" for the products and processes that embody the patents-in-suit; and (iii) additional photographs of the embodying products beyond those that Cambria already has produced. Pursuant to Rule 78 and Local Civil Rule 78.1, the Court has considered the disputes on the papers without oral argument. Exercising its discretion to manage discovery, the Court resolves the disputes as set forth below.[1]

---

[1] The Court does not resolve a fourth dispute set forth in the joint letter filed at [Dkt. 103], in which Hirsch seeks leave to amend some of its responses to Cambria's requests for admission. Because that dispute is similar to a separate pending dispute concerning Hirsch's request to amend some of its invalidity and infringement contentions [Dkt. 101], the Court will address those disputes together in due course.

I.      **BACKGROUND**

Cambria designs, manufactures, and markets natural quartz surface products, which have a variety of uses in homes and businesses, including countertops, floor tiles, vanities, fireplace surrounds, wet bars, and showers. [Dkt. 1 ("Compl.")] ¶ 11.  Cambria brought this action in February 2021 in the United States District Court for the Eastern District of Virginia, alleging that Hirsch, which manufactures and sells similar quartz surface products under the brand name Spectrum Quartz, willfully infringed eight patents—three utility patents and five design patents—that covered various products Cambria claims to have originally designed.  *Id.* ¶¶ 1, 3, 17.  More specifically, Cambria alleged that Hirsch willfully designed its products "to imitate Cambria's innovative products using Cambria's proprietary technology." *Id.* ¶ 22.  Hirsch answered Cambria's complaint in March 2021, denying liability and asserting that the patents-in-suit are invalid.  [Dkt. 17.]  Hirsch's motion to transfer the case to this Court was granted in April 2021.  [Dkts. 21, 34.]

Since an initial scheduling conference in this Court in June 2021, the parties have been engaged in discovery and claim construction practice.  Following a *Markman* hearing in May 2022, the Court filed an opinion and order in September 2022 construing pertinent claims of the asserted utility patents. [Dkts. 77, 88-89.]  Fact discovery closed in March 2023 and the parties presently are

2

engaged in expert discovery. Dispositive motions are scheduled to be filed in September 2023.

On March 7, 2023, the parties filed a joint letter outlining their respective positions regarding three discrete discovery disputes that they could not resolve on their own. [Dkt. 103.] The Court describes the specifics of those disputes in Section III, below.

## II.   LEGAL STANDARDS

Rule 26(b)(1) addresses generally the scope of discovery and it therefore governs the discovery disputes at issue here. The rule provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Additionally, the Court must limit the frequency or extent of discovery if (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1). Fed. R. Civ. P. 26(b)(2)(C).

3

As the party seeking disclosure of materials, Hirsch "bears the initial burden of showing the relevance of the requested information. The burden then shifts to [Cambria,] the party resisting discovery[,] to justify withholding it." *Lloyd-Jones v. Connolly*, Civ. No. 20-912 (EP) (LDW), 2022 WL 3572837, at *5 (D.N.J. Aug. 19, 2022) (quoting *Morrison v. Philadelphia Housing Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001)).

The Court has broad discretion in applying these principles and deciding discovery disputes like the ones raised here. *See United States v. Washington*, 869 F.3d 193, 220 (3d Cir. 2017) (noting that "[a]s we have often said, matters of docket control and discovery are committed to [the] broad discretion of the district court"); *Bristol-Myers Squibb Co. v. Dr. Reddy's Lab'ys, Ltd., et al.*, Civ. No. 19-18686 (MAS), 2021 WL 2661289, at *2 (D.N.J. Jan. 27, 2021); *Halsey v. Pfeiffer*, Civ. No. 09-1138, 2010 WL 3735702, at *1 (D.N.J. Sept. 17, 2010) (noting that "[d]istrict courts provide magistrate judges with particularly broad discretion in resolving discovery disputes"); *D'Agostino v. Domino's Pizza Inc.*, Civ. No. 17-11603 (PGS), 2019 WL 13256824, at *1 (D.N.J. Jan. 8, 2019) (quoting *Gerald Chamles Corp. v. Oki Data Americas, Inc.*, Civ. No. 07-1947 (JEI), 2007 WL 4789040, at *1 (D.N.J. Dec. 11, 2007) (noting that it is "well-settled that Magistrate Judges have broad discretion to manage their docket and to decide discovery issues")).

### III.     DISCUSSION

As noted, the parties have been unable to resolve disputes concerning three discrete issues. The Court describes and addresses each in turn.

   A.     <u>Settlement Agreement From the Cosentino Litigation</u>

Hirsch first requests that the Court order Cambria to produce a settlement agreement that it (Cambria) executed with non-party Cosentino International ("Cosentino") to resolve other patent litigation and proceedings pending in multiple jurisdictions. That litigation concerned, among other things, patents that Hirsch asserts are "at minimum comparable" to those at issue in this case. [Dkt. 103] at 1-2. The settlement agreement, Hirsch argues, is relevant to its claims and defenses, including the calculation of a reasonable royalty upon a finding of infringement. *Id.* at 2. Cambria, in response, objects to producing the settlement agreement because the patents in the Cosentino litigation did not concern and are neither related nor comparable to the patents-in-suit here.

At the Court's direction [Dkt. 122], Cambria submitted the settlement agreement, *ex parte*, for the Court's review *in camera*. Upon review of the agreement, the parties' submissions, and applicable law, several related considerations lead the Court to deny Hirsch's request to compel production of the agreement.

First, the patents at issue in the Cosentino litigation are different from and not family members of the patents at issue in this case. Hirsch highlights cases in

5

which courts have required the production of license agreements and settlement agreements as a metric to help determine a reasonable royalty in patent infringement actions. *See* [Dkt. 103] at 2 (citing cases). Some of those decisions, the Court recognizes, required production of those agreements where they concerned patents or technology "comparable" to the patents-in-suit—not necessarily limited only to the patents-in-suit. By contrast, Cambria highlights cases in which courts have limited disclosure of settlement or license agreements to those that concerned the same patents or families of patents as the patents-in-suit. *See id.* at 3-4 (citing cases).

On review of the case law and the record here, the Court believes that requiring broader disclosure of prior agreements that concern "comparable" patents or technology outside of the patents-in-suit would—in this case at least—tend to inject an unacceptable degree of subjectivity to the analysis, susceptible of producing an answer that could vary with the level of generality with which one approaches the comparison. On one level, the patents at issue in the Cosentino litigation and the patents-in-suit here both concern technology relevant to the design, creation, and manufacture of quartz products that emulate natural stone. In that sense, one might say that the two sets of patents are "comparable." On another level, however, the specific technology underlying the two sets of patents regard different technical processes and methods used to create those products. In that sense, the technology and processes—and thus the patents—are very different. *See infra*, next paragraph.

Although there may be situations where requiring disclosure of settlement and license agreements concerning patents other than those at issue in the instant litigation is appropriate, the Court is not convinced that this is one of them. The Court believes, rather, that drawing the discovery line at the patents-in-suit (and their families) is most prudent here. To be clear, the Court regards this proposition as a non-dispositive starting point. Applied here, it counsels against requiring Cambria to produce the settlement agreement from the Cosentino litigation.

Second, and relatedly, even if the Court were generally predisposed to require production of settlement agreements covering "comparable" patents outside of the patents-in-suit, Hirsch's own expert distinguished the relevant patents at issue in the Cosentino litigation from those at issue here, describing them as "completely different art." Hirsch argues that the expert's testimony was mere commentary on the distinctions between templates and molds, [Dkt. 103] at 3, but it reads that testimony far more narrowly than does the Court. Although the expert was, to be sure, discussing the differences between templates and molds, he did so in the same breath that he distinguished the *patents* at issue in the Cosentino litigation as "different patents," "different art," and "completely different art" than the patents-in-suit here. [Dkt. 103-1] at 161:12-25. Regardless of the similar title of some of the patents in the two cases [*cf.* Dkt. 103] at 2, this testimony undermines Hirsch's position that these are two sets of sufficiently "comparable" patents for purposes of

7

calculating a reasonable royalty. This evidence further counsels against requiring production of the Cosentino settlement agreement.

Third, upon its own *in camera* review, the Court finds the settlement agreement's already tenuous relevance diminished further still: The agreement resolved not only Cambria's claims against Cosentino for alleged infringement of the patents that Hirsch claims are comparable, but it also resolved Cosentino's claims against Cambria for infringement of entirely unrelated patents—some of which were asserted in a foreign court. The agreement also disposed of other administrative proceedings pending in yet another foreign jurisdiction. The Court, obviously, does not reveal here the agreement's specifics; for present purposes, it suffices to say that the agreement's consideration achieved a global resolution of competing cases, proceedings, and claims in multiple jurisdictions, which together undermine the ability to derive a reasonable royalty comparator for the patents-in-suit here. The nature of the resolution, in other words, substantially diminishes the agreement's relevance to this case. Based on its review *in camera*, the Court concludes that the settlement agreement's terms are not at all likely to lay the groundwork for the calculation of a reasonable royalty under the multi-factor *Georgia-Pacific* test.

Finally, the Court is mindful of and sensitive to requiring disclosure of a confidential settlement agreement implicating the confidentiality interests of a non-party. While not dispositive on its own, it is another relevant consideration of which

8

the Court can and does take note. *See, e.g.*, *Bristol-Myers Squibb, supra*, 2021 WL 2661289, at *2 (in patent infringement action, denying a party's discovery requests for confidential materials that the other party obtained in another patent litigation, which related to different patents than the patents-in-suit; in light of the marginal and speculative relevance of the materials at issue, giving weight to the fact that the materials involved confidential and proprietary information that belonged to a non-party).

Balancing these considerations together, the Court concludes that the Cosentino settlement agreement is not sufficiently relevant to Hirsch's claims or defenses and that compelling the document's production is not proportional to the needs of this case. Accordingly, the Court will deny Hirsch's request to compel Cambria to produce the settlement agreement.

    B.    <u>Cambria's Confidential "Recipes" for its Embodying Products and Processes</u>

Hirsch next requests that the Court order Cambria to produce its "recipes" for the quartz products and processes that embody the patents-in-suit (respectively, the "Embodying Products" and "Embodying Processes"). Based on the parties' arguments, the Court understands these "recipes" to be a shorthand term used to describe (i) the ingredients in the Embodying Products, *i.e.*, the minerals, pigments, binders, additives, and other components that make up the mixtures in the products,

9

and (ii) the specific steps taken to manufacture those products. Hirsch says these "recipes" are relevant to the case; Cambria says they are not.

The Court charts a middle course. Insofar as Hirsch seeks to learn the *ingredients* in the "recipes"—the specific minerals, pigments, binders, additives, and any other components—that the Embodying Products contain, the Court agrees with Cambria that that information is not relevant to any claim or defense in this case. No claim, limitation, specification, or embodiment of the asserted design or utility patents has anything to do with the identity of Cambria's proprietary inputs—the "stuff" used to manufacture the Embodying Products. The asserted design patents relate to the ultimate appearance of the Embodying Products as compared to Hirsch's accused products, without regard to what they contain. And the asserted utility patents relate to the processes by which the Embodying Products and the accused products are created, as well as the specific physical arrangement of their component parts—again without regard to what those parts specifically are. Accordingly, the ingredients identified in Cambria's "recipes" for the Embodying Products are not relevant to this case and, to the extent that Cambria has not already identified specific ingredients in discovery, they need not be disclosed. Likewise, to the extent that the "recipes" identify any suppliers or other sources of the ingredients, they too need not be disclosed.

The Court sees it differently insofar as Hirsch seeks information from the "recipes" regarding the Embodying Processes, meaning the specific steps by which

10

Cambria takes its inputs and amalgamates them together to create the Embodying Products. That information, the Court concludes, is relevant to Hirsch's claims or defenses concerning, at a minimum, Cambria's asserted utility patents and the extent to which its Embodying Products practice them—an issue that Hirsch says it intends to press in this litigation. To the extent that the requested "recipes" contain information regarding these processes, Cambria must disclose them, with appropriate redactions of identifying ingredients and suppliers.[2]

The Court recognizes the sensitivity of Cambria's "recipes," which contain trade secret protection for its proprietary information. The Court anticipates that the "Attorneys Eyes Only" provisions of the Discovery Confidentiality Order ("DCO") entered in this case, along with appropriate redactions of the ingredients in the Embodying Products and the suppliers of those ingredients, will go much (if not all) of the way to allay any concerns. Yet the Court remains sensitive and is open to erecting additional reasonable protections for Cambria's proprietary "recipes"—*if* such protections truly are necessary in light of the Court's limitations on disclosure outlined above. The parties are in the best position in the first instance to work out the appropriate confidentiality designation for these materials under the DCO, and to establish a protocol for their production, storage, access, and review.

---

[2]   Cambria notes that it already has produced samples of the Embodying Products and videos generally showing the Embodying Processes. [Dkt. 103] at 7. Notwithstanding the production of these materials, the Court does not find that requiring production of the specifying "recipes"—limited to the Embodying Processes—would be unduly cumulative.

11

The Court will therefore direct the parties to meet and confer regarding these issues, and to file a joint letter to the Court if they cannot agree on a workable protocol that sufficiently protects Cambria's information.

C.     Additional Photographs of Cambria's Embodying Products

Finally, Hirsch requests that the Court order Cambria to produce an unspecified number of additional photographs of the Embodying Products, beyond what Cambria already has produced.

As background, Cambria maintains an internal database that apparently houses photographs taken automatically of every slab that the company manufactures. In discovery, Hirsch initially requested that Cambria produce from this database photographs of ten different slabs for each Embodying Product, and Cambria did so. Later, Hirsch expanded this request, and asked that Cambria produce from this database and elsewhere, among other things, "[a]ll photographs of all products sold by Cambria"—whether the products had anything to do with the patents-in-suit or not. [Dkt. 103-6, Request 106.] Cambria objects to producing any photographs beyond what it already has produced, arguing that compliance with Hirsch's requests is unnecessary, technologically difficult, and prohibitively expensive.

Perhaps recognizing the evident overbreadth of its expanded request, Hirsch now seeks a more limited (but still unspecified) number of photographs of the Embodying Products. Its basis for the expanded request is its concern that Cambria

12

"self-selected" the ten photographs of each Embodying Product that it produced in a way that ensured the photographs support the position that the Embodying Products meet claim limitations requiring a predefined, predetermined, or repeatable pattern.

The Court denies Hirsch's request on multiple grounds. Among other things, requiring the production of more photographs would be unnecessarily cumulative, unduly burdensome, not reasonably proportional to the needs of the case, and not particularly important in resolving the issues in the case—all while being grounded on a speculative premise in the first instance.

For starters, Hirsch's animating concern—that Cambria self-selected the photographs that it produced in a self-serving manner—is stated but not supported. It is just as plausible (as Cambria represents) that all other photographs of the Embodying Products in the database are similar in appearance to the photographs that already have been produced. (Indeed, Cambria has offered to stipulate to exactly that.) Hirsch has not sufficiently articulated a reason to believe that the ten photographs of each Embodying Product already produced are anything other than representative of the entire dataset. In any event, while Hirsch apparently is dissatisfied with the ten photographs of each Embodying Product it received, it is not entirely clear how requiring the random production of an additional 20 or 30 additional photographs of each product (amounting to an additional 460 to 690 additional photographs) would resolve the issue.

13

Against this speculative concern, Hirsch demands that Cambria make its additional production in a way that ensures Hirsch is not "self-selecting" the additional photographs. Cambria explains, though, that its system is not designed to identify easily photographs from the database by product, and so it would be logistically and technically burdensome to comply with Hirsch's expanded request. Hirsch expresses doubt about that, but the Court has neither reason nor basis to do so. As an alternative, Hirsch offers that Cambria could randomly select every "n-th" photograph from the database, hypothesizing that some of the selected photographs would be of the Embodying Products. The Court declines Hirsch's proposal to require Cambria to produce additional photographs in a way that will almost certainly ensure production of an unnecessarily large sample set that includes dozens or hundreds of photographs of products not even at issue in this case.

Moreover, as Cambria notes, given the Court's *Markman* opinion, the claim limitations in the utility patents requiring predefinition, predeterminability, and repeatability do not relate to the finished product. *See* [Dkt. 88] at 11-16. Accordingly, Cambria argues persuasively that any variation in appearance of the finished slabs that *may* be evidenced by additional photographs in the database would not enhance Hirsch's legal position that Cambria does not practice its asserted patents. The Court does not go so far as to say that additional photographs of the Embodying Products are now categorically irrelevant to the case. But the Court does

14

agree that the relevance and importance of more photographs showing the products' final appearance are significantly diminished in light of the Court's claim construction order. The complexity and burden associated with requiring Cambria to produce several hundred more photographs, on the other hand, significantly outweighs the diminished relevance of those photographs.

Finally, given the technical burden associated with producing several hundred more photographs of the Embodying Products from the database, the Court also agrees with Cambria that if Hirsch believes securing additional photographs is important, it has the reasonable ability to obtain those photographs through other less burdensome means. *See* Fed. R. Civ. P. 26(b)(2)(C).

On the whole, the Court agrees with Cambria that Hirsh's request is something of a fishing expedition. Balancing the above considerations on the record before it, the Court will not require Cambria to produce additional photographs of the Embodying Products.

## IV. CONCLUSION

For the reasons stated, it is on this 29th day of June, 2023,

ORDERED that Hirsch's request to compel Cambria to produce the settlement agreement from the Cosentino litigation is DENIED; and it is further

ORDERED that Hirsch's request to compel Cambria to produce additional photographs of the Embodying Products is DENIED; and it is further

ORDERED that Hirsch's request to compel Cambria to produce its "recipes" is DENIED insofar as it seeks disclosure of the Embodying Products' proprietary ingredients and the suppliers or other sources of those ingredients, but GRANTED insofar as it seeks disclosure of the Embodying Processes used to generate the Embodying Products; and it is further

ORDERED that, subject to the below, Cambria shall produce to Hirsch all "recipes" of the Embodying Processes with all information identifying proprietary ingredients and ingredient suppliers and sources redacted; and it is further

ORDERED that the parties are directed to meet and confer regarding the appropriate confidentiality designation of the redacted "recipes" to be produced to Hirsch, and a protocol for storage, review, and access of those materials; and it is further

ORDERED that if the parties cannot agree on a protocol for designation, storage, access, and review of the redacted "recipes" to be produced to Hirsch, the parties shall file via CM/ECF a joint letter outlining the areas of their disagreement; and it is further

ORDERED that the Clerk of the Court shall terminate the motion pending at Docket Entry 103.

_____
J. BRENDAN DAY
UNITED STATES MAGISTRATE JUDGE